**In re Werner KOTZAB.**

No. 99–1231.
(Reexamination No. 90/004,441).

United States Court of Appeals, Federal Circuit.

June 30, 2000.

Robert F.I. Conte, Lee, Mann, Smith, McWilliams, Sweeney & Ohlson, of Chicago, Illinois, argued for appellant. Of counsel were Thomas Eugene Smith and James B. Conte.

Mark Nagumo, Associate Solicitor, U.S. Patent and Trademark Office, of Arlington, Virginia, argued for the appellee. With him on the brief were Albin F. Drost, Acting Solicitor, John M. Whealan, Acting Deputy Solicitor, and Stephen Walsh, Associate Solicitor.

Before LOURIE, GAJARSA, and LINN, Circuit Judges.

LINN, Circuit Judge.

## DECISION

Werner Kotzab appeals from the final decision of the Board of Patent Appeals and Interferences ("Board") holding claims 1–10 in reexamination number 90/004,441 unpatentable for obviousness under 35 U.S.C. § 103(a). *See Ex Parte Kotzab*, Paper No. 17 (BPAI July 15, 1998). This case was submitted for our decision following oral argument on April 4, 2000. Because certain of the Board's key factual findings relating to its obviousness analysis are not supported by substantial evidence, and because the Board erred in concluding that the claims would have been obvious as a matter of law, we reverse.

## BACKGROUND

### A. The Invention

The invention involves an injection molding method for forming plastic articles. In such methods, the temperature of the mold must be controlled so that the plastic can harden uniformly throughout the mold. Kotzab was confronted with the problem of providing optimal temperature control for an injection molding method to ensure the quality of the final product on the one hand, and achieving optimally short molding cycle times on the other hand. He arrived at a solution which is embodied in claim 1 of the reexamination as follows:

1. An improved method of controlling the temperature of an injection mold by pressure feeding molding material into a mold recess of an injection mold by an extruder, curing the material in the mold, and removing molded material from the mold, said pressure feeding, curing, and removing being a molding cycle of recurring molding cycles and said recurring molding cycles having at least a first molding cycle and a second molding cycle,

comparing a preset nominal temperature to an actual temperature measured by at least one temperature sensor during said first molding cycle and said second molding cycle and supplying an amount of a temperature controlling medium to the first molding cycle and the second molding cycle, said amount of temperature controlling medium being dependent on the deviation between the actual temperature measured and the desired preset nominal temperature, the improvement comprising:

controlling, via a single sensor, a plurality of flow control valves for the tempera-

ture controlling medium to provide impulse temperature control medium to the first and second molding cycles,

determining empirically or by calculation a quantitative spacial distribution of temperature controlling medium needed to obtain said desired preset nominal temperature during at least the first molding cycle and the second molding cycle and determining empirically or by calculation the conduits needed to be utilized to obtain the desired preset nominal temperature during at least the first molding cycle and the second molding cycle,

comparing said desired preset nominal temperature to said actual temperature, at least once during the first molding cycle and the second molding cycle at a certain point in time being the same for each said molding cycle, such that said comparison made during said first cycle is synchronized with said comparison made during said second subsequent molding cycle, and said plurality of flow control valves are triggered during each said cycle to provide said impulse control medium, and said triggering being dependent on the deviation of temperature determined for each said comparison and also being dependent on a stored profile of said quantitative spacial distribution of the temperature controlling medium.

J.A. at 18–19.

Claim 3, which depends from claim 1, adds the following further limitation: "wherein a flow measuring turbine is associated with each flow control valve to detect the actual flow in each cycle and wherein a proportioning of a cooling or heating medium is effected in dependence on a comparison of a nominal flow to the actual flow." *Id.* at 19.

Claim 10, which depends from claim 3, additionally provides that "the rotation of said measuring turbine is transferred into pulses, so that the nominal flow [of the temperature controlling medium] can be fixed by the presetting of a corresponding number of pulses." *Id.* at 20.

## B. The Reexamination Proceeding

U.S. Patent 5,427,720 ("the '720 patent") issued to Kotzab on June 27, 1995. A third party filed a request for reexamination on November 4, 1996. The reexamination was granted and assigned control no. 90/004,441. The amended claims were finally rejected by the Examiner, and Kotzab appealed the rejections to the Board. On July 15, 1998, the Board affirmed the Examiner's rejection of the claims for essentially the reasons expressed in the Examiner's Answer. The Board did, however, provide its own additional comments primarily for emphasis.

Specifically, the Board agreed with the Examiner that WO 92/08598 ("Evans") discloses a process of controlling the temperature of an injection mold by using a sensor to control the pulsing of a temperature control medium through the mold. Moreover, the Board found, as explained by the Examiner, that Evans discloses in a less preferred embodiment, using only one temperature measurement to control the coolant pulses rather than an average temperature measurement. *See* Evans application, p. 6, II. 17–23.

In addition, the Board found that Evans discloses that "the optimum timing of the cooling flow can be selected in accordance with the known temperature of the mould." *Id.* at II. 6–8. Furthermore, the Board found that a prior art promotional article discloses that manipulation of the geometry and layout of the cooling segment provides for the greatest improvement in molding cycle. *See* Horst Wieder, *Understanding the pulse modulated mold temperature control method,* (CITO Products, Inc., WI.) 1987, at p. 1, col. 2, II. 13–16. And, the Board determined that a May 1984 prior art article indicates that it was known to establish a cooling regime before the mold is produced, and that the determination of the cooling regime includes the number and location of the cooling conduits, as well as the volume of the coolant flow. Thus, the Board concluded that the evidence of record indicates that it

was known in the art to utilize empirical data to design the mold and the distribution of cooling channels in that mold. In view of the foregoing, the Board found that the empirical determination of the necessary spacial distribution of the length of the cooling pulses needed for delivering the appropriate coolant is disclosed by Evans or was known at the time the invention was made. Consequently, the Board affirmed the Examiner's rejection of claims 1, 2, and 4–9 under 35 U.S.C. § 103(a) as being unpatentable over Evans.

The Board made additional findings related to claims 3 and 10 in determining that they were also unpatentable under 35 U.S.C. § 103(a) over Evans in view of certain secondary references.

Kotzab filed a request for reconsideration, which the Board denied on November 24, 1998. In that decision, the Board reiterated agreement with the Examiner that it would have been obvious for one of ordinary skill in the art to utilize only one temperature measurement to control the coolant pulses in light of the Evans disclosure. Kotzab timely appealed the Board's decision to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) (1994).

## DISCUSSION

### A. Standard of Review

A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *See* 35 U.S.C. § 103(a) (Supp. III 1997); *In re Dembiczak*, 175 F.3d 994, 998, 50 USPQ2d 1614, 1616 (Fed.Cir.1999). The ultimate determination of whether an invention would have been obvious under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact. *See Dembiczak*, 175 F.3d at 998, 50 USPQ2d at 1616. We review the Board's ultimate determination of obviousness de novo. *See id.* However, we review the Board's underlying factual findings for substantial evidence. *See In re Gartside*, 203 F.3d 1305, 1316, 53 USPQ2d 1769, 1776 (Fed.Cir. 2000).

Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence. *See id.* at 1312, 203 F.3d 1305, 53 USPQ2d at 1773 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229–30, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). In reviewing the record for substantial evidence, we must take into account evidence that both justifies and detracts from the factual determinations. *See id.* (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). We note that the possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's findings from being supported by substantial evidence. *See id.* Indeed, if a reasonable mind might accept the evidence as adequate to support the factual conclusions drawn by the Board, then we must uphold the Board's determination. *See id.*

### B. Analysis

A critical step in analyzing the patentability of claims pursuant to section 103(a) is casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field. *See Dembiczak*, 175 F.3d at 999, 50 USPQ2d at 1617. Close adherence to this methodology is especially important in cases where the very ease with which the invention can be understood may prompt one "to fall victim to the insidious effect of a hindsight syndrome wherein that which only the invention taught is used against its teacher." *Id.* (quoting *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 USPQ 303, 313 (Fed.Cir.1983)).

Most if not all inventions arise from a combination of old elements. *See In re Rouffet*, 149 F.3d 1350, 1357, 47 USPQ2d 1453, 1457 (Fed.Cir.1998). Thus,

every element of a claimed invention may often be found in the prior art. *See id.* However, identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention. *See id.* Rather, to establish obviousness based on a combination of the elements disclosed in the prior art, there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant. *See In re Dance,* 160 F.3d 1339, 1343, 48 USPQ2d 1635, 1637 (Fed.Cir. 1998); *In re Gordon,* 733 F.2d 900, 902, 221 USPQ 1125, 1127 (Fed.Cir.1984). Even when obviousness is based on a single prior art reference, there must be a showing of a suggestion or motivation to modify the teachings of that reference. *See B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582, 37 USPQ2d 1314, 1318 (Fed.Cir.1996).

 The motivation, suggestion or teaching may come explicitly from statements in the prior art, the knowledge of one of ordinary skill in the art, or, in some cases the nature of the problem to be solved. *See Dembiczak,* 175 F.3d at 999, 50 USPQ2d at 1617. In addition, the teaching, motivation or suggestion may be implicit from the prior art as a whole, rather than expressly stated in the references. *See WMS Gaming, Inc. v. International Game Tech.,* 184 F.3d 1339, 1355, 51 USPQ2d 1385, 1397 (Fed.Cir.1999). The test for an implicit showing is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art. *See In re Keller,* 642 F.2d 413, 425, 208 USPQ 871, 881 (1981) (and cases cited therein). Whether the Board relies on an express or an implicit showing, it must provide particular findings related thereto. *See Dembiczak,* 175 F.3d at 999, 50 USPQ2d at 1617. Broad conclusory statements standing alone are not "evidence." *Id.*

 Kotzab's primary argument that the Board erred in holding claims 1–10

unpatentable under 35 U.S.C. § 103(a) over Evans, or Evans in view of secondary references, is that Evans does not teach or suggest the use of a single temperature sensor to control a plurality of flow control valves. We agree.

As noted previously, the Board adopted the Examiner's reasoning in upholding the rejection of the claims and added further comments. None of the Board's comments relate to the issue of Evans teaching or suggesting the use of one *sensor* to control a number of valves regulating coolant flow to the mold. Thus, we look to the Examiner's reasons for finding this limitation to be expressly taught or suggested in Evans.

The Examiner cites Evans for teaching that "one *system* constructed and operated according to the invention may be used to control a number of valves." Evans application, p. 19, II. 6–8 (emphasis added). In view of this disclosure only, the Examiner concluded that Evans teaches the use of one *sensor* to control a number of valves. This conclusion must necessarily rest on the unstated premise by the Examiner that "one system" is equal to "one sensor."

But the Board's decision, adopting the Examiner's premise, lacks the necessary substantial evidence to support a rejection of Kotzab's claims. Specifically, there is not substantial evidence to show that "one system" is the same thing as "one sensor." The words "sensor" and "probe" are used throughout Evans to refer to the device that measures the mold temperature. Evans uses the word "signal" to refer to the response generated by the measured temperature that controls the valves for coolant flow. Finally, the word "system" is used in Evans to refer to the overall temperature control system that is responsible for the valve timing for coolant flow to increase or decrease the temperature of the mold. Evans clearly never uses the term "system" as a substitute for the simple temperature measuring device it calls "sensor." And, the Board made no reference to any evidence in the record that

would equate "one system" with "one sensor."

As mentioned previously, more than a mere scintilla of evidence is necessary to support the Board's implicit conclusion that "one system" is equal to "one sensor." Based on the entirety of Evans' disclosure, we cannot say that there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that "one system" means "one sensor."

The United States Patent and Trademark Office argues that because Evans teaches that a single sensor may be used to provide "the temperature measurement at a selected part of the machine," it necessarily follows that the Evans "system" discussed later may have a single sensor— and that single sensor may control more than one valve. *See id.* at p. 6, II. 21–23; p. 19, II. 6–8. While the test for establishing an implicit teaching, motivation, or suggestion is what the combination of these two statements of Evans would have suggested to those of ordinary skill in the art, the two statements cannot be viewed in the abstract. Rather, they must be considered in the context of the teaching of the entire reference. Further, a rejection cannot be predicated on the mere identification in Evans of individual components of claimed limitations. Rather, particular findings must be made as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed.

We do not take issue with the argument that Evans suggests the concept of using the historic temperature obtained by one temperature measurement to control coolant pulses. *See id.* at p. 5, II. 14–22; p. 6, II. 17–23. However, there is not substantial evidence of record to extrapolate this teaching to the multiple zone system described later in Evans. *See id.* at p. 18, I. 22 to p. 19, I. 8. In the multiple zone system, Evans describes the use of a temperature sensor and an associated flow control valve in each zone. At most, the combined teachings suggest that the his-

toric temperature of a mold zone may be measured by one sensor, and as part of a multiple zone system where multiple valves are controlled, that one sensor measurement can be used to control the valve for that zone. Thus, we cannot say that there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that where there are a plurality of control valves in a multiple zone setting, only one temperature sensor provides the control for a plurality of valves.

Moreover, we cannot say that there is such relevant evidence as a reasonable mind might accept as adequate to support implicitly the conclusion that a skilled artisan confronted with (1) the problem noted by Kotzab, i.e., providing optimal temperature control for an injection molding method to ensure the quality of the final product on the one hand, and achieving optimally short molding cycle times on the other hand, and (2) the two statements in Evans, would have been motivated to control a plurality of valves in a multiple zone setting with only one temperature sensor.

In this case, the Examiner and the Board fell into the hindsight trap. The idea of a single sensor controlling multiple valves, as opposed to multiple sensors controlling multiple valves, is a technologically simple concept. With this simple concept in mind, the Patent and Trademark Office found prior art statements that in the abstract appeared to suggest the claimed limitation. But, there was no finding as to the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with no knowledge of Kotzab's invention to make the combination in the manner claimed. In light of our holding of the absence of a motivation to combine the teachings in Evans, we conclude that the Board did not make out a proper *prima facie* case of obviousness in rejecting claims 1, 2, and 4– 9 under 35 U.S.C. § 103(a) over Evans. Moreover, because the rejections of claims 3 and 10 rely upon the foregoing, we also

conclude that the Board did not make out a proper *prima facie* case of obviousness in rejecting those claims under 35 U.S.C. § 103(a).

### CONCLUSION

For the above reasons, we conclude that there is not substantial evidence to support the Board's finding of fact that Evans expressly teaches that "one sensor" may be used to control a plurality of valves, and there is not substantial evidence of record, either expressly or implicitly, to modify the teachings of Evans to obtain a system in which one sensor controls a plurality of valves. Accordingly, we

*REVERSE.*